UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

DAVID JACKSON,                                                        PLAINTIFF

VERSUS                                           CIVIL ACTION NO. 1:19-CV-332-LG-RPM

PELICIA HALL, MDOC
COMMISSIONER, ET AL.,                                                             DEFENDANTS

**REPORT AND RECOMMENDATION**

## I.      Introduction

On June 20, 2019, plaintiff David Jackson ("Jackson"), proceeding *pro se* and *in forma pauperis*, filed the present 42 U.S.C. § 1983 ("Section 1983") prisoner civil rights Complaint alleging violations of his constitutional rights by defendants Pelicia Hall ("Commissioner Hall"), Joe Errington ("Errington"), Centurion of Mississippi ("Centurion"), Dr. Gloria Perry ("Dr. Perry"), and Dr. Ronald Woodall ("Dr. Woodall"). Doc. [1]. Before the Court are several motions, including: (i) a motion for summary judgment filed by defendants Centurion and Dr. Woodall, Doc. [86];[1] (ii) a motion for summary judgment filed by Dr. Perry, Commissioner Hall, and Errington, Doc. [94]; and (iii) a motion for a preliminary injunction filed by Jackson. Doc. [66].

## II.      Facts

In 1998, Jackson entered the custody of the Mississippi Department of Corrections ("MDOC"); he has remained in custody since that time. Doc. [93], Ex. 2, at 3–5. In 2006, Jackson was diagnosed with Hepatitis C ("HCV"). Doc. [42], (T. 18). HCV is a bloodborne virus that is

---

[1] In passing, Jackson's argument that Centurion and Dr. Woodall filed their motion in an untimely fashion is meritless. Doc. [95]. On July 22, 2021, Centurion and Dr. Woodall moved to extend the motions deadline until August 23, 2021; the motion was granted. Doc. [82]. On August 23, 2021, they filed the instant motion. Doc. [86].

"commonly spread by sharing contaminated needles, using unsterilized tattoo equipment, and engaging in sexual behavior." *Woodcock v. Correct Care Sols.*, 861 F. App'x 654, 655 (6th Cir. 2021). In the early or acute stage of HCV, the disease can cause "jaundice, nausea, and fatigue." *Gordon v. Schilling*, 937 F.3d 348, 351 (4th Cir. 2019). However, only some individuals will "clear" HCV after the acute phase concludes; up to 85% of those infected will develop chronic HCV, *Roe v. Elyea*, 631 F.3d 843, 848 (7th Cir. 2011), which can only be cured with medication, *Woodcock,* 861 F. App'x at 655 n.1. The majority suffering from chronic HCV are asymptomatic and 33% of those sufferers will "show no evidence of liver disease." *Roe*, 631 F.3d at 848. Notwithstanding this fact, between 10% and 40% of infected individuals will show "progressive fibrosis that leads to cirrhosis[,]" *Roe*, 631 F.3d at 848, *Woodcock,* 861 F. App'x at 655, which is a "severe condition causing the liver's affected areas to stop functioning[,]" *Woodcock,* 861 F. App'x at 655. Currently, there is no reliable way to predict *which* chronic HCV patients will develop cirrhosis/fibrosis, *Roe*, 631 F.3d at 848, or *when* they will develop cirrhosis/fibrosis, *Woodcock,* 861 F. App'x at 655. "Some people might not develop scarring for 20 to 30 years, while others might suffer accelerated scarring." *Ibid.* Finally, while the FDA approved a new class of direct-acting antivirals ("DAAs") in 2011 that treat HCV with a nearly 100% cure rate, the treatment comes at a steep price—a single course of treatment costs "between $13,000 and $32,000." *Ibid.* With this context in mind, the Court turns to the relevant period, which begins in 2012.[2]

---

[2] In his Complaint, Jackson does not define a temporal scope of his claims. Doc. [1]. However, at Jackson's *Spears* hearing, U.S. Magistrate Robert H. Walker liberally—and broadly—construed Jackson's Complaint to encompass his entire first term in custody at SMCI—March 28, 2012 to November 27, 2019, Doc. [42], (T. 9–10); [93], Ex. 2, where he stayed continuously with the sole exception of a month stay at Central Mississippi Correctional Facility in 2018, Doc. [93], Ex. 2, at 4–5. Jackson neither objected to this liberal construction nor subsequently moved to amend his Complaint to broaden its scope. Furthermore, the defendants relied on the 2012–2019 scope of suit. *See*, *e.g.*, Doc. [86, 93]. Indeed, discovery has ended and fully-briefed summary judgment motions are ripe for disposition. Therefore, the Court declines Jackson's invitation to *now* consider any potential claims arising after November 27, 2019, including, *inter alia*, any claim related to an ambiguous HCV medical record from August 2020. Doc. [98], Ex. 12.

On March 28, 2012, Jackson was transferred to the South Mississippi Correctional Institution ("SMCI") and immediately enrolled in the prison's chronic care program for HCV. Doc. [86], Ex. 1, at 1–2; [93], Ex. 2, at 4. Through the chronic care program, SMCI medical staff monitor inmates with HCV by tracking their Fibrosis-4 and AST to Platelet Ratio Index ("ASPI") scores, which are "non-invasive testing method[s] to measure scarring of the liver." *Ibid.* Once an inmate's scores approach or exceed a certain level, the inmate is "automatically referred to a specialist for evaluation of treatment with anti-viral medications" and also receives "serial monitoring of lab results during treatment," which includes "viral titer levels, genotype of infection, and liver enzymes, as well as abdominal sonograms to rule out hepatoma tumors." *Ibid.* For example, if an inmate's Fibrosis-4 score approaches or exceeds 3.5, he would be entitled to treatment. *Ibid.* Likewise, if, for example, an inmate's APRI score approaches or exceeds 2.5, he would also be entitled to treatment. *Spiers v. Perry*, No. 1:17–CV–281–RHW, 2019 WL 2373199, at *2 (S.D. Miss. June 5, 2019). In addition, chronic care staff conduct periodic physical examinations to look for "signs of disease, including ascites and jaundice." Doc. [86], Ex. 1, at 2.

During the relevant period, Dr. Woodall, SMCI's onsite medical doctor and a "contracted medical provider" with Centurion between 2015 and 2020, oversaw Jackson's medical treatment, including for HCV. Doc. [86], Ex. 1, at 1. Upon his enrollment in SMCI's chronic care program, prison medical staff routinely monitored Jackson's HCV scores. Doc. [86], Ex. 1, at 2–3; [90], at 22, 26, 42; [93], Ex. 3, at 180, 194, 212, 239, 242, 262, 286, 328, 343, 406, 456–57, 452, 490, 506, 530, 559, 569, 599, 730, 743–44, 770, 845. Typically, Jackson received HCV testing every six

---

By the same token, Jackson is not precluded from filing another lawsuit that relates to conduct occurring *after* November 27, 2019. *Triplett v. Banks*, No. 1:17–CV–65–RHW, 2019 WL 2092568, at *5 (S.D. Miss. May 13, 2019). Even assuming *arguendo* that the Court considered Jackson's ambiguous, single-page medical record, the medical record does not state that he needs treatment with medication or put forth HCV scores that would reflect a need for medication or indicate that his HCV scores have, in fact, worsened. Doc. [98], Ex. 12. Indeed, during the relevant period, Jackson's AST and ALT levels were frequently high, but his HCV scores remained at normal levels. *See, e.g.*, Doc. [93], Ex. 3, at 457, 490, 560.

3

months, though he only received annual testing on two occasions. *Ibid.* Furthermore, prison medical staff met with Jackson every 3 to 6 months to conduct a physical examination. *See*, *e.g.*, Doc. [86], Ex. 1, at 2; [93], Ex. 3, at 377, 491, 733, 777, 839, 924; [102], at 4. Throughout the relevant period, Jackson's HCV scores remained at a "normal" or "fair" level and did not require treatment with DAAs. *See*, *e.g.*, Doc. [86], Ex. 1, at 2; [93], Ex. 3, at 328, 344, 378, 406, 417–18, 491, 706, 743–44, 778, 840, 845–46, 921. Indeed, Jackson's last Fibrosis-4 score during the relevant period was far below 3.5. Doc. [86], Ex. 1, at 2; [93], Ex. 3, at 906–7.

Jackson also suffers from chronic back pain.[3] In July 2017, Jackson began experiencing severe back pain and was diagnosed with lumbago. Doc. [93], Ex. 3, at 623, 626, 629, 633.[4] Prison medical staff prescribed Jackson with pain medication and sent him for an X-ray, which was performed on July 31, 2017. *Id.*, Ex. 3, at 626, 628. His X-ray results revealed "[m]ild degenerative osteophytic spurring," "bony foraminal," and "disc space narrowing [at] L5-S1[,]" but "no abnormalities." *Id.*, Ex. 3, at 632, 803, 865. During this time, Jackson was regularly prescribed naproxen and muscle rub to relieve his pain symptoms. *Id.*, Ex. 3, at 623, 626–27. By September 2017, he stopped complaining of back pain. *Id.*, Ex. 3, at 636, 647, 650.[5]

Jackson did not complain of back pain again until November 21, 2018. Doc. [93], Ex. 3, at 776–78. On that date, prison medical staff prescribed Jackson with a "bottom bunk profile," noted that he had a pending offsite orthopedic consultation, and prescribed indomethacin for his pain

---

[3] In his Complaint, Jackson alleges the defendants were deliberately indifferent to degenerative joint disease ("DJD") in his back. Doc. [1], at 9; [42], (T. 9). However, Jackson's relevant medical records reflect that he was not formally diagnosed with DJD until July 18, 2019. Doc. [93], Ex. 3, at 622. Indeed, his medical records only reflect an *ongoing* diagnosis of lumbago, *id.*, Ex. 3, at 623, 727, 870, 914, which is "localized pain in the lumbar (lower) region of the back." *Perdue v. Astrue*, 810 F. Supp. 2d 674, 680 n.18 (D. Del. 2011). Therefore, liberally construing Jackson's Complaint, the Court has encompassed lumbago *and* DJD in its analysis under the umbrella term "chronic back pain."
[4] During the relevant period, Jackson only complained about back pain once before: on February 6, 2014. Doc. [93], Ex. 3, at 338–39.
[5] In passing, Jackson's medical records also reflect complaints of shoulder/arm pain. Doc. [93], Ex. 3, at 754. However, Jackson specifies that the instant complaint only deals with HCV and back pain. Doc. [1]; [42], (T. 11–12, 15).

4

symptoms. *Id.*, Ex. 3, at 776–78, 786. On February 26, 2019, Jackson followed up with prison medical staff about the offsite consultation. *Id.*, Ex. 3, at 801–3. At that time, prison medical staff requested that Jackson receive an offsite MRI. *Id.*, Ex. 3, at 803. Thereafter, Jackson neither complained of back pain nor requested pain medication for several months. *Id.*, Ex. 3, at 804–62.

On July 15, 2019, Jackson began complaining of back pain again. *Id.*, Ex. 3, at 863–64. After reviewing his 2017 X-ray, prison medical staff opined that he suffered from "DJD of the lumbar spine." *Id.*, Ex. 3, at 864–66. At this time, he was prescribed indomethacin, Solu-Medrol, and a back brace. *Ibid.* A follow-up X-ray was performed on July 19, 2019. *Id.*, Ex. 3, at 865; [98], Ex. 8. According to Dr. Elliot Wagner, the test results only revealed "mild osteoarthritis of the lumbar spine." *Ibid.* Neither surgery nor other treatment was recommended at that time. *Ibid.* Thereafter, on October 16, 2019, Jackson was sent offsite for an MRI. *Id.*, Ex. 3, at 899–900, 903. According to Dr. Richard McCarthy, Jackson's MRI results revealed "mild disc bulge," "narrowing of the spinal canal but no foraminal stenosis," and "broad-based disc bulge at L5–S with no significant effect on the thecal sac;" Dr. Thomas Cullom, III concurred. Doc. [98], Ex. 9–10. Neither surgery nor further treatment was recommended. *Id.*, Ex. 3, at 903. During the relevant period, Jackson did not complain of back pain again. *Id.*, Ex. 3, at 930–979.

### III. <u>Standard of Review</u>

Summary judgment is appropriate if the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c). "All facts and inferences must be viewed in the light most favorable to the non-movant." *Koerner v. CMR Constr. & Roofing, L.L.C.*, 910

F.3d 221, 227 (5th Cir. 2018) (citation omitted). "'When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (quotation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).[6]

### IV. Qualified Immunity Generally

In a Section 1983 case, a government official acting in his individual capacity can raise qualified immunity as an affirmative defense. *Saucier v. Katz*, 533 U.S. 194, 203, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The doctrine of qualified immunity attempts to balance two competing societal interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Messerschmidt v. Millender*, 565 U.S. 535, 546, 132 S.Ct. 1235, 182 L.Ed.2d 47 (2012) (quotation omitted).

At the first prong, the Court asks: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."

---

[6] An inmate's medical records can defeat his allegations. *Mendoza v. Lynaugh*, 989 F.2d 191, 193–95 (5th Cir. 1993) (relying on medical records that contradicted *Spears* hearing testimony).

*Ibid.* At the second prong, the Court considers whether the government official's conduct violates "clearly established" law. *Hernandez v. Mesa*, ––– U.S. –––, 137 S.Ct. 2003, 2007, 198 L.Ed.2d 625 (2017) (per curiam). At this prong, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151. The rule relied on by the plaintiff must be "'settled law,' . . . which means it is dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority[.]'" *District of Columbia v. Wesby*, ––– U.S. –––, 138 S.Ct. 577, 589–90, 199 L.Ed.2d 453 (2018) (citations omitted). In short, the legal principle at issue must be described with a "high 'degree of specificity,'" *id.* at 590 (quotation omitted), and be "beyond debate," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 743, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011).

## V.   Analysis

### A. Sovereign Immunity

The Court begins with Jackson's official capacity claims against the defendants. Pursuant to the Eleventh Amendment, "the Constitution does not provide for federal jurisdiction over suits against nonconsenting States." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) (collecting cases). This means that the State sovereign, including its departments and agencies, is generally immunized from cases seeking monetary damages or equitable relief. *Papasan v. Allain*, 478 U.S. 265, 276, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). There are, however, exceptions to the general rule of sovereign immunity: (i) a state may consent to be sued, *College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense Bd.*, 527 U.S. 666, 675–676, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999); (ii) Congress may "unequivocally" abrogate state immunity through "a valid exercise of [its] power," *Seminole Tribe of Fla. v.*

7

*Florida*, 517 U.S. 44, 59, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996); or (iii) a litigant may sue a state official in his official capacity seeking prospective injunctive relief to redress an ongoing violation of federal law, *Ex parte Young* [*Young*], 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

Here, the MDOC is an "arm" of the State of Mississippi and, thus, the defendants are generally entitled to raise sovereign immunity as an affirmative defense to suit in federal court. *See, e.g., Brown v. Perry*, No. 3:19–CV–544–RPM, 2021 WL 1160964, at *5 (S.D. Miss. Mar. 25, 2021). Furthermore, Mississippi has not waived sovereign immunity in Section 1983 cases, including the present case. Miss. Code Ann. § 11–46–5(4). Similarly, Congress did not abrogate state sovereign immunity in cases arising under Section 1983. *Quern v. Jordan*, 440 U.S. 332, 340, 99 S.Ct. 1139, 1145, 59 L.Ed.2d 358 (1979). Finally, Jackson cannot proceed with his lawsuit under the *Young* exception. To proceed with an official capacity claim under *Young*, "a complaint must allege that the defendant *is violating* federal law, not simply that the defendant has done so." *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 394 (5th Cir. 2015) (emphasis in original) (citation omitted). While Jackson certainly seeks prospective injunctive relief, his Complaint only encompasses conduct occurring between March 28, 2012 and November 27, 2019. Doc. [42], (T. 9–10); *Wilson v. Barrientos*, 926 F.2d 480, 482 (5th Cir. 1991). Since Jackson only seeks prospective injunctive relief arising from *previous* constitutional violations, he is not alleging an ongoing violation of federal law and cannot proceed under *Young*. *NiGen Biotech, L.L.C.*, 804 F.3d at 394. The defendants are entitled to sovereign immunity insofar as he sues them in their official capacity.

### B. Deliberate Indifference

#### i. Law Generally

In order to succeed on a medical deliberate indifference claim, an inmate must first prove a "serious medical need," i.e. "objective exposure to a substantial risk of serious harm." *Petzold v.*

*Rostollan*, 946 F.3d 242, 249 n.23 (5th Cir. 2019). Second, the inmate must prove "that prison officials acted or failed to act with deliberate indifference to that risk." *Gobert v. Caldwell*, 463 F.3d 339, 345–46 (5th Cir. 2006). To succeed on the second prong, the inmate must demonstrate that the prison official had "actual knowledge," *Lawson v. Dallas Cty.*, 286 F.3d 257, 262 (5th Cir. 2002), that the "inmate[] face[d] a substantial risk of serious bodily harm[,]" *Petzold*, 946 F.3d at 249, and "despite [his] actual knowledge of the substantial risk, denied or delayed the prisoner's medical treatment." *Ibid.*

### ii. **Deliberate Indifference:** Treatment versus Monitoring

There is no doubt that chronic HCV presents a serious medical need. *See*, *e.g.*, *Grumbles v. Livingston*, 706 F. App'x 818, 819 (5th Cir. 2017); *Bender v. Regier*, 385 F.3d 1133, 1137 (8th Cir. 2004).[7] Absent treatment, between 10% and 40% of chronic HCV patients suffer irreversible liver scarring and, perhaps, death. *Roe*, 631 F.3d at 848; *Woodcock,* 861 F. App'x at 655. Since liver scarring can begin at any time, a HCV sufferer faces a *substantial risk* of serious harm upon infection. *Ibid.* Nevertheless, there is no certainty *which* chronic HCV patients will develop liver scarring or *when* they will develop it; after all, liverscarring can occur quickly or only after decades. *Ibid.* At the same time, new DAAs are very expensive. *Woodcock*, 861 F. App'x at 655. In light of competing interests, courts have generally identified two different methods of measuring deliberate indifference in the HCV context.

---

[7] In passing, the Court touches on the State defendants' motion to revoke IFP. Doc. [73]; [94], at 3–4. Every Court of Appeals to address the issue has concluded that chronic HCV places an afflicted inmate in "imminent danger of serious physical harm." *See*, *e.g.*, *Mitchell v. Nobles*, 873 F.3d 869, 874 (11th Cir. 2017); *Vandiver v. Prison Health Servs., Inc.*, 727 F.3d 580, 585–86 (6th Cir. 2013); *Ibrahim v. D.C.*, 463 F.3d 3, 6–7 (D.C. Cir. 2006). Within itself, chronic HCV can plainly cause serious liver damage or death; the process can also start at any time. *Woodcock,* 861 F. App'x at 655. Indeed, the Fifth Circuit has not questioned that chronic HCV constitutes a "serious medical need" for deliberate indifference purposes. *Grumbles*, 706 F. App'x at 819. Nevertheless, courts have recognized a more targeted approach to preventing frequent filers from attaching parasitic claims to an HCV claim. *Pettus v. Morgenthau*, 554 F.3d 293, 300 (2d Cir. 2009) (holding that struck-out inmate cannot proceed IFP on claims lacking nexus to claimed imminent danger of bodily harm); *Pinson v. United States Dep't of Just.*, 964 F.3d 65, 71–72 (D.C. Cir. 2020); *Malloy v. Cty. of Montgomery, Alabama*, No. 2:18–CV–1067–WHA, 2019 WL 386231, at *2 (M.D. Ala. Jan. 8, 2019).

On the one hand, *monitoring* an inmate's HCV constitutes constitutionally sufficient treatment in the absence of evidence that cirrhosis (or perhaps even fibrosis) is likely occurring. *Roy v. Lawson*, 739 F. App'x 266, 267 (5th Cir. 2018) (per curiam); *Grumbles*, 706 F. App'x at 818. As such, so long as an inmate's HCV scores remain below a certain level, his preference for DAAs rather than monitoring amounts to nothing more than a disagreement over appropriate treatment. *Gobert*, 463 F.3d at 346. By implication, however, prison officials cannot turn a blind eye to an inmate's HCV diagnosis and avoid monitoring progression of the disease altogether. *Gordon*, 937 F.3d at 357–58; *Woodcock*, 861 F. App'x at 660.

On the other hand, while the cost of treatment may carry weight for a time, "[t]he Constitution is violated when [costs] are considered to the exclusion of reasonable medical judgment about inmate health." *Roe*, 631 F.3d at 866. After an inmate's monitored HCV scores exceed certain levels and cirrhosis (or perhaps even fibrosis) has likely begun, mere monitoring no longer meets the minimum demands of the Eighth Amendment. *Salahuddin v. Goord*, 467 F.3d 263, 281–82 (2d Cir. 2006); *Gordon*, 937 F.3d at 348. Instead, a prison official's constitutional duty shifts from monitoring to treatment with DAAs. *Salahuddin*, 467 F.3d at 281–82; *Bender*, 385 F.3d at 1137.

### ii. Application

#### a. Hepatitis C

Here, the defendants were not deliberately indifferent to Jackson's HCV-related medical needs. At the outset, while modestly climbing for a time, Jackson's HCV scores never rose above normal levels and, therefore, did not require more than monitoring. Doc. [86], Ex. 1, at 2; Doc. [93], Ex. 3, at 180, 194, 211, 239, 242, 262, 417–18, 491, 706, 743–44, 778, 840, 845–46, 921. Turning to his monitoring treatment, Jackson's Fibrosis-4 and ASPI scores were typically tested every six

months.[8] *Ibid.* Fibrosis-4 and APRI scores present effective ways to monitor HCV. *Woodcock*, 861 F. App'x at 655. In addition, chronic care medical staff physically examined Jackson for signs of disease every 3 to 6 months. *See*, *e.g.*, Doc. [93], Ex. 3, at 377, 491, 733, 777, 839, 924. As such, to the extent that Jackson currently disagrees about the proper HCV treatment, he merely has a different opinion than the defendants about treatment—nothing more. *Gobert*, 463 F.3d at 346. For these reasons, the defendants were not deliberately indifferent to Jackson and are entitled to qualified immunity on this claim. *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151.

### b. Chronic Back Pain

Here, the defendants were also not deliberately indifferent to Jackson's chronic back pain. At the outset, Jackson was only diagnosed with a cognizable back problem, lumbago, on July 13, 2017.[9] Thereafter, on each occasion that Jackson complained of lower back pain, he was swiftly prescribed pain medication. *See*, *e.g.*, Doc. [93], Ex. 3, at 626, 629, 803, 865–67. Indeed, when naproxen or indomethacin were deemed insufficient to resolve his symptoms, Jackson received back injections, muscle rub, a lower bunk profile, and a back brace. *See*, *e.g.*, *id.*, Ex. 3, at 865–67. Furthermore, periodic tests were performed on his lower back, including at least two X-rays and an MRI. *Id.*, Ex. 3, at 626, 865; [98], Ex. 8–10. Finally, neither reviewing consultants nor prison medical staff opined that Jackson needed surgery or any other specific treatment.[10] *Ibid.* In

---

[8] At least in the context of generally receiving biannual testing, the two occasions where Jackson only received annual testing amounts, at most, to ordinary negligence. *Roy*, 739 F. App'x at 267; *Grumbles*, 706 F. App'x at 818.

[9] Prior to those complaints, he only complained of back issues once in early 2014. Doc. [93], Ex. 3, at 338–39. No diagnosis was made. *Ibid.* He received pain medication and did not complain of back pain again for three years. *Ibid.* To the extent Jackson argues that this complaint alone constitutes deliberate indifference, his claim fails.

[10] During his *Spears* hearing, Jackson claimed that an offsite physician determined that he needed surgery. Doc. [42], (T. 14). However, he later walked back this statement and claimed that the physician believed more conservative treatment was appropriate first. *Id.*, (T. 15). In any case, the physician's purported statements are not competent summary judgment evidence. *Francois v. Gen. Health Sys.*, 459 F. Supp. 3d 710, 723 (M.D. La. 2020) (noting that Fed. R. Evid. 803(4) refers to statements by person *seeking* treatment, not doctor); Fed. R. Evid. 802.

light of the above, the defendants were not deliberately indifferent and are entitled to qualified immunity. *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151.

### C. Conditions of Confinement

Next, the Court liberally construes Jackson's claim against Commissioner Hall for the MDOC's purported failure to have "*any* disease control policy" as a conditions of confinement claim. Doc. [1], at 6. Likewise, out of an abundance of caution, the Court construes Jackson's reference to "dirty, unsafe, understaffed, and infested" prisons as a separate conditions of confinement claim. *Ibid.*

The U.S. Constitution "'does not mandate comfortable prisons,' but neither does it permit inhumane ones." *Ball v. LeBlanc*, 792 F.3d 584, 594 (5th Cir. 2015) (quotation omitted). "To be tantamount to the infliction of cruel and unusual punishment, prison conditions must pose 'an unreasonable risk of serious damage' to a prisoner's health . . . and prison officials must have acted with deliberate indifference to the risk posed . . . ." *Ibid.* The objective component requires "extreme deprivation of any 'minimal civilized measure of life's necessities.'" *Davis v. Scott*, 157 F.3d 1003, 1006 (5th Cir. 1998). The subjective prong requires "deliberate indifference to inmate health or safety." *Ball*, 792 F.3d at 594 (quotations omitted).

Here, Jackson's sweeping and vague claim that MDOC lacks "any infectious disease policy" is meritless. Doc. [1], at 6. The summary judgment evidence of record illustrates that: (i) MDOC has a hepatitis policy, Doc. [42], (T. 22, 25); [86], Ex. 1; (ii) yearly tuberculosis testing, Doc. [93], Ex. 3, at 247, 334, 790; and (iii) a flu shot available annually, *id.*, Ex. 3, at 471, 643, 767. Plainly, the MDOC has at least *some* infectious disease policies in place so it does not lack of "*any* infectious disease policy." Doc. [1], at 6. As a result, Commissioner Hall is entitled to qualified immunity on this claim. *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151.

Next, Jackson's claim that SMCI was a "dirty, unsafe, understaffed, and infested" prison fails to state a claim upon which relief can be granted. Doc. [1], at 6. First, Jackson has not identified that he was personally exposed to these conditions. *Ball*, 792 F.3d at 594. Second, these conditions do not, without more, constitute an "extreme deprivation of any 'minimal civilized measure of life's necessities.'" *Davis*, 157 F.3d at 1006; *Simpson v. Cruz*, No. SA09CV0125AG(NN), 2010 WL 2232838, at *5 (W.D. Tex. June 1, 2010). Third, Jackson does not identify which, if any, defendants were actually aware of these purported conditions. *Ball*, 792 F.3d at 594. As a result, the defendants are entitled to qualified immunity. *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151.

### D. Supervisor Liability

"Under Section 1983, supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability." *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987) (citations omitted). Instead, supervisors may only be held liable if: "(i) they affirmatively participate in acts that cause constitutional deprivation; or (ii) implement unconstitutional policies that causally result in [a] plaintiff's injury." *Mouille v. City of Live Oak*, 977 F.2d 924, 929 (5th Cir. 1992) (citations omitted). Under the first theory, a supervisor may be held individually liable if he has "personal involvement" in the underlying "constitutional deprivation." *Thompkins*, 828 F.2d at 304. Under the second theory, a supervisor may be held individually liable if he implements "a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation[.]'" *Brown v. Cain*, 546 F. App'x 471, 475 (5th Cir. 2013) (quotation omitted). Finally, absent personal involvement, "supervisor liability requires an underlying constitutional violation before such liability can be imposed." *Tamez v. Manthey*, 589 F.3d 764, 772 (5th Cir. 2009) (quotation omitted).

Here, insofar as Jackson sues the defendants on a theory of vicarious liability, summary judgment must be granted in their favor. *Mouille*, 977 F.2d at 929. Next, the Court has already concluded that the defendants did not personally violate of Jackson's constitutional rights. In turn, the first route to supervisory liability is foreclosed to Jackson. Second, as there was no underlying constitutional violation, Jackson cannot proceed against the defendants under the second theory. *Tamez*, 589 F.3d at 772. For these reasons, the defendants are entitled to qualified immunity on Jackson's supervisory claims. *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151.

### E. Equal Protection

Finally, the Court addresses Jackson's equal protection claim *sua sponte*. 28 U.S.C. § 1915(e)(2). *See also* Doc. [1], at 7. According to Jackson, the defendants violated his Fourteenth Amendment equal protection rights by giving some prisoners, but not him, HCV medication. Doc. [1], at 7; [42], (T. 25). "[A] party who wishes to make out an Equal Protection claim must prove 'the existence of purposeful discrimination' motivating the [governmental] action which caused the complained-of injury." *Johnson v. Rodriguez*, 110 F.3d 299, 306 (5th Cir. 1997). To establish an equal protection claim, a plaintiff must show that he was treated differently from similarly-situated persons without a rational basis. *United States v. Abou-Kassem*, 78 F.3d 161, 165 (5th Cir. 1996); *Sonnier v. Francis*, 217 F. App'x 410, 411 (5th Cir. 1997) (per curiam).

Here, Jackson has failed to state an equal protection claim because his claim is wholly conclusory. Doc. [1, 42]; *Taylor v. El Centro Coll.*, No. 3:21–CV–0999–D, 2022 WL 102611, at *11–*12 (N.D. Tex. Jan. 10, 2022) (collecting cases). For one, he fails to identify a purpose behind the defendants' purported discrimination. Likewise, he fails to identify similarly situated individuals, i.e., individual similar "in all relevant respects," who were treated differently than him. *Dawson v. Archambeau*, 763 F. App'x 667, 673–74 (10th Cir. 2019). Finally, he has not

identified why the MDOC hepatitis policy is irrational. *Ibid.* For these reasons, he has failed to state an equal protection claim and it should be dismissed.[11]

### VI. Motion for Preliminary Injunction

Finally, the Court addresses Jackson's motion for a preliminary injunction, which, for the reasons above, only relates to the relevant period, i.e. March 28, 2012 to November 27, 2019. Doc. [66]. To obtain a preliminary injunction, a movant must demonstrate: "(1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is denied; (3) the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) the injunction will not disserve the public interest." *Texans for Free Enterprise v. Texas Ethics Com'n*, 732 F.3d 535, 536-37 (5th Cir. 2013) (quotation omitted). The movant must carry all four elements to receive a preliminary injunction. *Voting for America, Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013). Here, Jackson seeks a preliminary injunction requiring the defendants to provide him with HCV DAAs and "proper" back pain treatment. However, he has not shown that there is a substantial likelihood of success on the merits. During the relevant period, i.e. 2012 to 2019, the defendants were not deliberately indifferent for the reasons set forth above. *See, e.g.*, Doc. [86], Ex. 1; [93], Ex. 3, at 626, 629, 730, 743–44, 770, 845. As a result, Jackson has failed to meet the first preliminary injunction element and is, therefore, not entitled to such relief.

In the alternative, the Court briefly addresses whether Jackson is entitled to a permanent injunction for the relevant period, i.e. between March 28, 2012 and November 27, 2019. It is well-established that the standards for preliminary and permanent injunctions are "essentially the same" with "the exception that the plaintiff must show actual success on the merits rather than a mere

---

[11] To the extent that Jackson attempts to bring a supervisor liability claim grounded in equal protection, it fails. He has failed to plead an underlying constitutional violation in the first instance. *Mouille*, 977 F.2d at 929.

likelihood of success." *Villas at Parkside Partners v. City of Farmers Branch*, 577 F. Supp. 2d 858, 877 (N.D. Tex. 2008) (quotation omitted). He must establish every element to receive a permanent injunction. *Env't Texas Citizen Lobby, Inc. v. ExxonMobil Corp.*, 824 F.3d 507, 533 (5th Cir. 2016). For the reasons above, Jackson has not shown actual success on the merits. For these reasons, Jackson is not entitled to a permanent injunction.

## RECOMMENDATION

Based on the foregoing, the undersigned recommends that the defendants' motions for summary judgment should be granted. Furthermore, the undersigned recommends that Jackson's motion for preliminary injunction should be denied.

## NOTICE OF RIGHT TO APPEAL/OBJECT

Pursuant to 28 U.S.C. § 636(b)(1), any party who desires to object to this report must serve and file written objections within fourteen (14) days after being served with a copy unless the time period is modified by the District Court. A party filing objections must specifically identify those findings, conclusions and recommendations to which objections are being made; the District Court need not consider frivolous, conclusive or general objections. Such party shall file the objections with the Clerk of the Court and serve the objections on the District Judge and on all other parties. A party's failure to file such objections to the proposed findings, conclusions and recommendation contained in this report shall bar that party from a *de novo* determination by the District Court. Additionally, a party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in this report within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions that have been accepted by the district court and for which

there is no written objection. *Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1428–29 (5th Cir. 1996).

**SO ORDERED AND ADJUDGED**, this the 27th day of January 2022.


/s/ *Robert P. Myers, Jr.*
ROBERT P. MYERS, JR.
UNITED STATES MAGISTRATE JUDGE